## CHARLES W. ADAMS vs. ANSEL C. MARSHALL.

Hampshire.    Sept. 18, 1884. — Jan. 10, 1885.    C. ALLEN & COLBURN, JJ.,
                             absent.

A., the owner of a tract of land containing about sixteen acres, used by him as
   a homestead, purchased with his sons B. and L. a lot called the T. lot, which
   adjoined his lot on the west and on the south, and another lot, called the S. lot,
   which lay westerly of the T. lot, and southerly of a portion of the homestead
   lot.  After the purchase, the three lots were used together for farm purposes,
   and the fences between the lots were taken down.  A barn on the lot of sixteen
   acres was moved partly on to the T. lot, and was the only barn on the farm.
   The father by his will devised the lot of sixteen acres to his son B. on condition
   that he furnished support to the testator's widow, and the rest of his property
   to his sons B. and L.  B. conveyed the lot of sixteen acres to J. and C., and B.
   and L. conveyed the S. lot and the T. lot to C. alone.  J. and C. then conveyed
   to M. a lot of land containing sixteen acres, "being the former homestead of
   A.," subject to the provisions in the will of A. for the support of his widow.
   The deed described the land on the south and west as bounded by a line running
   east and south about a certain number of rods on the S. lot and the T. lot to
   a highway.  The T. lot was but two rods in width, and the distance stated did
   not correspond precisely with the actual length of the lines, whether the T. lot
   was included in the grant or excluded.  Held, that the T. lot was excluded.
   Held, also, that oral evidence was inadmissible to show that the parties intended
   that this lot should pass by the deed.  Held, also, that so much of the barn as
   was upon this lot did not pass as appurtenant to the land granted.
The owner of a lot of land, on which was a barn, conveyed, by a warranty deed,
   a portion of the land, by metes and bounds, the boundary line in fact running
   through the barn.  The grantee cut off so much of the barn as was on his
   own land.  Held, that the grantor could maintain an action against the grantee
   for the loss of support and of shelter to the plaintiff's portion of the barn.

TORT for breaking and entering the plaintiff's close in Hadley,
and cutting off a portion of a barn standing partly thereon and
partly on the adjoining land of the defendant.   Answer: 1. A
general denial.   2. That the barn was on land conveyed by the
plaintiff and one Joseph H. Adams to the defendant, as the for-
mer homestead of Joseph Adams, by deed dated April 1, 1874.
3. That, if the barn was not on land included in said deed, it
passed as appurtenant to the homestead.   Trial in the Superior
Court, without a jury; before *Knowlton*, J., who allowed a bill
of exceptions, in substance as follows :

The land described in the plaintiff's declaration was a narrow
strip, two rods in width, running back from a highway in a
northerly direction, its western line being twenty-eight rods

and some links, and its eastern line being a little over twenty-seven rods. The lot was known as the Tower lot.

The deed from the plaintiff and Joseph H. Adams to the defendant, referred to in the answer, was a warranty deed; it conveyed by metes and bounds a parcel of land, described as " containing sixteen acres of land, more or less," and as " being the former homestead of Joseph Adams." The deed contained this clause : " The same is conveyed, however, subject to the provisions in the will of the late Joseph Adams for the support of his widow, Rebecca E. Adams, so far as relates to her use and occupancy of the house and garden, but no further."

There was no dispute that this deed conveyed to the defendant land east of the Tower lot, and also land north of it, and north of a lot lying west of the Tower lot, and known as the Amanda Smith lot. A copy of a portion of a plan used at the trial is printed in the margin.*

The main question in the case was whether the deed to the defendant included or excluded the Tower lot. The deed described the premises as bounded by a line beginning at the southeast corner of the premises, and thence running by metes and bounds to the northwesterly corner of the Amanda Smith lot, and thence " east and south about eighty-six rods on the said Amanda Smith lot and Samuel Tower lot, so called, to the highway first mentioned, thence east about twenty rods on said highway to the first mentioned corner." It appeared from the plan used at the trial that the line described as running

east and south, if it excluded the Tower lot was eighty-six rods and two links in length, and if it included the Tower lot it was eighty-seven rods and fourteen links. It further appeared from said plan, that if the line described as running "east about twenty rods" ran from the east side of the Tower lot it was sixteen rods and fifteen feet long; if from the west side it was eighteen rods and fifteen feet long.

It appeared in evidence, that, at the date of the deed to the defendant, no monument stood on the land at the end of any of the lines given in the deed, and there was no evidence where any monument had stood.

The plaintiff put in evidence certain deeds from which the following appeared: In 1841, Joseph Adams bought of Alpheus Osborne a tract of land described as containing sixteen acres, more or less, and as bounding on certain roads, and lands of other persons, but giving no distances. By his will, dated February 13, 1863, and admitted to probate in 1864, he devised to his son Benjamin "the dwelling-house and other buildings where we now live, together with about sixteen acres of land, being the same with the improvements that I purchased of Alpheus Osborne," subject to the use and occupancy of a part devised to the testator's wife, and on condition that Benjamin should provide her with a good and comfortable support and maintenance during widowhood. The residue of the testator's real and personal estate was devised to his sons, Benjamin and Levi.

In January, 1872, Benjamin, in part consideration that the grantees would maintain and support the widow of Joseph Adams, according to the provisions of the will of Joseph, conveyed to Joseph H. Adams and Charles W. Adams "that certain parcel of land, containing sixteen acres more or less, conveyed to me by the last will and testament of the late Joseph Adams, deceased, . . . . with one half of the house in which I now live, and one fourth of all other buildings on the above-described parcel of land." The description in this deed was similar to that in the deed to the defendant. The last two lines were as follows: "Thence east and south on the Amanda Smith lot and Samuel Tower lot, belonging to said Benjamin and Levi, to the highway leading past my dwelling-house; thence east about twenty rods to the first-mentioned corner."

In May, 1853, Samuel Tower conveyed the Tower lot to Benjamin, Joseph, and Levi Adams; and in November, 1858, the Amanda Smith lot was conveyed to the same persons. In August, 1872, Benjamin and Levi Adams conveyed the Smith and Tower lots to the plaintiff, reserving to the grantors "the buildings thereon consisting of barn and sheds." These buildings, in 1874, became the property of Joseph H. Adams and the plaintiff, and, in 1880, Joseph H. sold them to the plaintiff.

The barn in question was the only one, except a tobacco barn, near the dwelling-house, or used in connection with it or with the Joseph Adams homestead. It was thirty-six feet square, and stood east of the Tower lot on the same lot with the house in May, 1853, when Samuel Tower conveyed the Tower lot to Joseph, Benjamin, and Levi Adams, who were then doing business as copartners, under the firm name of Joseph Adams & Sons, and were carrying on the farm, including the land sold to the defendant. The plaintiff put in evidence that this firm, in June, 1853, added somewhat to the old barn after moving it in part on to the Tower lot, then just purchased, but no part of it was west of the Tower lot; that it remained in the changed position when cut in two by the defendant in the spring of 1883. It appeared that said Joseph and Benjamin occupied the house together for many years till 1864 (when Joseph died), and used the barn in question, with their house, as a part of the homestead of Joseph Adams; that said barn was also used by Joseph, Benjamin, and Levi in connection with all the land shown on the plan after the Amanda Smith lot was conveyed, in 1858, and with other land they owned in the vicinity; that thereafter all the land shown on the plan was used together for a common purpose, that of tilling or mowing.

There was evidence that, when the Tower lot was conveyed, in 1853, there was a fence on the easterly side of it, which fence was taken down immediately after such conveyance; that the barn which previously stood on the Adams homestead lot was moved on to the Tower lot.

Shortly after the defendant went into possession of his land, the plaintiff told him that his title did not cover the whole barn. The plaintiff went with a surveyor, taking the deeds of the Amanda Smith and the Tower lots, and ran out a line as the

line between the Tower lot and the homestead lot, which line the surveyor testified was the line the defendant used in cutting the barn, and that he did not cut west of it. It appeared that the plaintiff and the surveyor drove and left some stakes on this line so run by them. There was evidence that the defendant told the plaintiff he was going to cut off the easterly part of the barn up to the said staked line, and that the plaintiff said the defendant had a right to take away the defendant's part of the barn, but that one of the stakes on the said line had been moved; that the defendant ascertained by said surveyor thereafter, who went upon the premises and measured and sighted to ascertain the truth, that none of the stakes had been moved, and cut up to said line, but not west of it, and removed the part of the barn east of said line. The plaintiff contended that he told the defendant whatever the law would allow him to do he could not object to. It was admitted that the cutting was done in a workmanlike manner. The barn floor ran through the barn from north to south, and was eleven feet wide, having a bay for hay on the easterly side of it, and stalls, with a scaffolding for hay over them, on the westerly side of the floor. The entrance doors were on the northerly and southerly sides. Soon after the defendant went into possession in 1879, the plaintiff took possession of the barn floor except a strip through on the easterly side of it one foot wide, and put up timbers on said floor ten feet in width through the barn to hang tobacco on, and left the defendant to use only said strip of floor one foot wide, and the part of the barn east of it, which the plaintiff claimed was up to his line of ownership, and was all the defendant was entitled to under his deed.

The plaintiff contended that the line in dispute should run according to the easterly line of the Tower lot. It appeared that the defendant cut west of that line two feet four inches at one end and one foot eight inches at the other. The defendant contended that the line should run according to the westerly line of the Tower lot, and asked the judge so to rule. The judge declined so to rule.

The defendant offered oral evidence to show that the intention of the parties was that the Tower lot should pass to the defendant by this deed, which evidence was excluded.

The defendant asked the judge to rule that the barn passed to the defendant as parcel of the Joseph Adams homestead, and as appurtenant to said homestead; that the plaintiff had no right or servitude of support for the part of the barn which was on the plaintiff's land; that the plaintiff was estopped to claim the servitude of support. The judge refused to give any of these rulings; found that the easterly line of the Tower lot was the line between the parties; and found for the plaintiff, and assessed damages for cutting west of said line; and for the loss of support to the plaintiff, and for loss of shelter to the plaintiff's part of the barn. The defendant alleged exceptions.

*W. G. Bassett*, for the defendant.

*D. W. Bond*, for the plaintiff.

FIELD, J. The deed of Joseph H. Adams and Charles W. Adams to the defendant, dated April 1, 1874, as we construe it, did not convey the Tower lot. It bounds the premises " thence east and south about eighty-six rods on the said Amanda Smith lot and Samuel Tower lot, so called, to the highway first mentioned." If it had been the intention to include the Tower lot in the grant, this boundary would have been on the Amanda Smith lot to the highway. A boundary on a lot ordinarily excludes the lot.

A comparison of the description of the granted premises in the other deeds recited in the exceptions only confirms the construction we have given to this deed to the defendant, and makes it certain that it conveyed only the original homestead of Joseph Adams, which he devised to Benjamin Adams, and which did not include the Tower lot. The court therefore properly refused to rule " that the line should run according to the westerly line of the Tower lot." The boundary was the easterly line of the Tower lot.

Oral evidence was inadmissible to show that the parties intended that " the Tower lot should pass to the defendant by this deed; " and there is no other exception to the finding of the presiding justice that the easterly line of the Tower, lot was the true line.

It is not denied by the plaintiff, that, so far as the barn was situated on the land conveyed, it passed to the defendant by virtue of the deed. One claim of the plaintiff is, that the

defendant in cutting off the easterly end of the barn cut over the line, and upon the land of the plaintiff, and this the presiding justice has found to be true, and has assessed damages therefor.

The defendant asked the court to rule that the whole barn passed to the defendant as parcel of, or appurtenant to, the homestead of Joseph Adams. This was rightly refused. There is no mention of the barn in the deed to the defendant; the premises are conveyed by metes and bounds. Whatever title the defendant has in the barn has been acquired because the barn was so attached to the realty as to have become a part of it, and therefore that part of the barn which was within the boundaries of the land conveyed to him passed to him by the deed as a part of the premises conveyed. The use of the whole barn was not necessary to the enjoyment of the premises granted, and there are no words in the deed whereby the grant can be extended beyond the boundaries of the land.

The plaintiff contended that he had a right to have the whole barn remain as it was at the time of the conveyance to the defendant, and that the defendant had no right to cut off the portion of it which was on his land, and thus deprive the portion on the plaintiff's land of the support and shelter which the easterly end of the barn afforded. The defendant asked the court to rule " that the plaintiff had no right or servitude of support for the part of the barn which was on the plaintiff's land." This ruling was refused, and damages were assessed " for the loss of support to the plaintiff, and for loss of shelter to the plaintiff's part of the barn."

The plaintiff relies upon *Pierce* v. *Dyer*, 109 Mass. 374 The only point decided in that case was, that, when the owner of a dwelling-house conveys to two persons distinct parts of it, separated vertically by an imaginary plane, there is no implied obligation on one grantee to keep his part in repair for the benefit of the other part. The opinion, however, assumes as settled, " that, where two or more houses, so constructed as to require mutual support, are conveyed to different owners, or where separate portions of one dwelling become vested in different owners, a right of support, as incident to the property, passes by the conveyance to each grantee, unless excluded by the terms of

the grant;" and *Richards* v. *Rose*, 9 Exch. 218, is cited. The court also say: "It is to be considered that the necessity which lies at the foundation of the right arises from the existing relations of artificial structures, for the time being constituting part of the freehold, but liable to be destroyed by the action of the elements or by mere lapse of time. When thus destroyed, it is fair to presume that the parties intend, in the absence of any agreement, that the easement shall end with the necessity which created it." In *Richards* v. *Rose*, the declaration alleged that the plaintiff owned a messuage and dwelling-house, and was entitled to have the same supported by the adjoining land and premises of the defendant; that the defendant dug a drain, and removed a part of his land, and thereby deprived the messuage and dwelling-house of the plaintiff of the support to which she was entitled, whereby the walls of her house cracked and gave way. No question of the right of shelter as distinguished from the right of the plaintiff to have her house supported by the defendant's premises arose; and the declaration apparently proceeds upon the ground that the plaintiff's right of support to her land and building had been invaded by the removal of the support afforded by the defendant's land. The case finds that the plaintiff's and defendant's houses adjoined each other on the same street, and had been originally the property of the same person, who had demised them to one person by separate instruments, and the lessee had mortgaged his interest in both, and the mortgagee under a power had sold the leasehold interest in one to the plaintiff, in July, 1849, and in the other to the defendant, in September following. The action therefore was between the holders of leasehold estates derived from the same owner, "to recover compensation for damage done to the plaintiff's house by the disturbance of its foundations." The defendant contended that there was no evidence that the plaintiff's title was prior to that of the defendant; but the court held that the question of priority did not affect the matter; assumed that the houses were all built together, and each obviously required the support of its neighbors for their common protection and security; and further held that in such a case there is either by a presumed grant or a presumed reservation a right to such mutual support.

The law in this Commonwealth relating to reservations which are implied by law in favor of the grantor in a deed was carefully considered in *Carbrey* v. *Willis*, 7 Allen, 364. The distinction is taken between a conveyance of a messuage, house, farm, manor, or mill, and a conveyance by metes and bounds; by the former, many things pass which have been used with the principal thing, as parcel of, or appurtenant to, the granted premises, which will not pass by the latter. Whatever is included or excluded from the grant by reason of the construction given to the deed, is included or excluded by the terms of the deed. By grants or reservations by implication of law are meant such as the law implies from the circumstances, and which are not found by construction in the contract. The court refused to follow *Pyer* v. *Carter*, 1 H. & N. 916, and held the rule in respect to easements which pass by implication with some strictness even against the grantor, or between grantees taking deeds at the same time from the same grantor, and say that, " Where there is a grant of land by metes and bounds, without express reservation, and with full covenants of warranty and against incumbrances, we think there is no just reason for holding that there can be any reservation by implication, unless the easement is strictly one of necessity." The strictness with which this rule is held, as between grantees from one grantor by deeds simultaneously delivered, is shown by *Buss* v. *Dyer*, 125 Mass. 287; and, as is there stated, the English cases which deny the authority of *Pyer* v. *Carter* agree with ours, that a grantor cannot be permitted to derogate from his absolute grant unless in case of strict necessity. See also *Wheeldon* v. *Burrows*, 12 Ch. D. 31; *Russell* v. *Watts*, 25 Ch. D. 559.

The familiar instance of a reservation by implication of law is a way by necessity. The law upon ways by necessity has been frequently considered by this court, and it is established that such ways exist only so long as the necessity exists; that the necessity required is not an absolute necessity; that the reservation of such a way to the grantor is to be implied when necessary, as well as a grant of such a way to the grantee; and that this implied reservation of a way to the grantor over the land granted is not a breach of the covenants of warranty or against incumbrances contained in the deed. If the landowner

can at reasonable cost construct a way over his own land, there is no way by necessity. *Schmidt* v. *Quinn*, 136 Mass. 575. *Brigham* v. *Smith*, 4 Gray, 297.

*Richards* v. *Rose, ubi supra*, was assumed to be settled law in *Pierce* v. *Dyer, ubi supra*, and the case is perhaps approved in England by those judges who question or deny the authority of *Pyer* v. *Carter*, on the assumption that the two houses were so constructed as to be mutually subservient and dependent on each other, neither being capable of standing or being enjoyed without the support it derived from its neighbor. *Wheeldon* v. *Burrows*, 12 Ch. D. 59. *Suffield* v. *Brown*, 4 DeG., J. & S. 185, 197. *Russell* v. *Watts, ubi supra*.

*Mitchell* v. *Seipel*, 53 Md. 251, is a well-considered case, in which the distinction between grants and reservations by implication is carefully traced, and the doctrine maintained that the grantor cannot derogate from his own absolute grant so as to claim rights over the thing granted, yet it cites with approval *Richards* v. *Rose, ubi supra*, and says, "This furnishes another instance of an easement of necessity within the exception to the general rule forbidding implied reservations." These implied rights of support of the grantor and grantee in the premises of each other have been called mutual or reciprocal easements, because there is a necessity for mutual support; *Russell* v. *Watts, ubi supra;* and the burden imposed on each is accompanied by a corresponding benefit to the other.

It is probable that the demise in *Richards* v. *Rose* was, in terms, of a house, and that the house was divided by a partition from the adjoining house, although they were so constructed that each required the support of the other. We are not, however, required to determine in the case at bar whether, if the deed had conveyed, in terms, a part of the barn, each then would not have had the right to insist that the whole remain as it was at the time of the conveyance, or whether the rights of the grantee are or are not in this respect greater than those of the grantor. The plaintiff as one of the grantors conveyed to the defendant, by warranty deed, the premises by metes and bounds. There is no reference to the barn, but the boundary line in fact ran through the barn. The plaintiff has reserved no rights in the part conveyed; there is nothing in the deed that, by construction, gives

him any rights in it; and, by implication of law, he can have none that are not strictly necessary to the enjoyment of his estate. After the repeated references to *Richards* v. *Rose,* either with approval or without disapproval, we do not feel at liberty to hold that the necessity for support from the defendant's premises does not exist, because the plaintiff can erect a sufficient support upon his own land, although a way by necessity would not be implied under similar circumstances. It is the injury to the plaintiff's estate by the acts of the defendant, after the grant, in changing the existing relations between the two estates, that the plaintiff complains of.

The plaintiff has no right to the light or air that comes to him from the defendant's part. The defendant, we have no doubt, could have lawfully erected a partition through the barn upon his line. It cannot be that the plaintiff has the right to compel the defendant to permit his end of the barn, however long it may be, to remain on his land for the plaintiff's benefit. The only right of the plaintiff, we think, is the right of support to his end. Although this right is a conventional and not a natural one, because it is an artificial structure, we think it is analogous in many respects to the right to the lateral support of land by land. This right does not prevent one landowner from removing the soil, and withdrawing the natural support, provided he furnishes the adjoining landowner with an equivalent support, as by a wall or other structure, and does no actual damage to the adjoining land. The defendant had, we think, the right to cut off his end of the barn, provided he left the plaintiff's part as well supported as before; but so far as he has by his acts impaired the plaintiff's right to support, he is liable in damages. The difficulty is in determining whether the plaintiff's right of support included also the right to the shelter afforded by the covering of the defendant's part. In *Pierce* v. *Dyer, ubi supra,* it is assumed that the right of support included that of shelter, but no decisions to that effect have been shown us. Some analogy may perhaps be derived from the reciprocal rights and obligations of the owner of an upper to the owner of a lower tenement in the same building. It has been said that the owner of the lower tenement has no right to destroy the supports of the upper tenement, and that the owner of the upper tenement has no right to destroy the

coverings which protect the lower tenement, although, at common law, neither is bound to the other to repair his tenement. The actual decisions on this subject are meagre, except in the case of mines, where the right of the owner of the soil to subjacent support is well settled. See *Loring* v. *Bacon*, 4 Mass. 574; *Calvert* v. *Aldrich*, 99 Mass. 74; *Graves* v. *Berdan*, 26 N. Y. 498; *Stevens* v. *Thompson*, 17 N. H. 103; *Cheeseborough* v. *Green*, 10 Conn. 318; *McCormick* v. *Bishop*, 28 Iowa, 233; *Ottumwa Lodge* v. *Lewis*, 34 Iowa, 67; *Caledonian Railway* v. *Sprot*, 2 Macqueen, 449; *Harris* v. *Ryding*, 5 M. & W. 60; *Humphries* v. *Brogden*, 12 Q. B. 739; *Dalton* v. *Angus*, 6 App. Cas. 740.

The necessity which was apparent in the case at bar was that each part should have the support and shelter of the other, for its beneficial use. Although the plaintiff could construct a support and shelter for his part upon his own land, yet all adjoining landowners can do this, and they are not compelled in this way to protect their land as a substitute for the natural support and protection of adjoining land. See *Mears* v. *Dole*, 135 Mass. 508. We think similar considerations apply when similar rights are acquired in artificial structures, and that, if the defendant removed his end of the barn, he was bound to supply an equivalent support and shelter, or pay the plaintiff the cost of constructing such a support and shelter, if it were practicable to construct them, and the cost did not exceed the damage to the plaintiff's estate, and that the rulings of the court were substantially correct.

The measure of damages is not necessarily what it would cost the plaintiff to construct such a support and shelter, but compensation for the injury to his estate caused by reason of having been deprived by the defendant of the existing support and shelter. *Gilmore* v. *Driscoll*, 122 Mass. 199.

No exception has been taken to the rule of damages, if the loss of shelter was to be considered as an element of damage. As the right is reserved to the plaintiff by implication of law out of his grant, he is not estopped from claiming it by the covenants in his deed. *Exceptions overruled.*