## MARY L. HAMMOND *vs.* IRA A. ABBOTT.

Essex.    March 27, 30, 1896. — September 5, 1896.

Present: FIELD, C. J., ALLEN, HOLMES, MORTON, & BARKER, JJ.

*Writ of Entry — Law and Fact — Deed — Release of Condition — "Adjoining" Land — Estoppel — Evidence — New Trial.*

Where, at the trial of a writ of entry, the evidence is conflicting upon the points in issue, a request that a verdict be ordered for the tenant is rightly refused.

If a husband conveys land, through a third person, to his wife, to hold so long as she remains his widow, and afterwards executes a lease of the land for the term of her life to A., who, on the same day, assigns the lease to her, the lease and assignment may be found, at the trial of a writ of entry by her to recover the land, to be parts of one transaction, in which the husband released to the wife through A., as a conduit, the condition subject to which she held the land under the deed, and such a release is valid; and a request by the tenant for a ruling that the demandant did not take any estate in any portion of the premises under the lease and assignment is rightly refused.

A conveyance of a dwelling-house, "together with land under and adjoining said house as now used with it," may include adjoining land covered with buildings as well as vacant land.

If a dwelling-house is conveyed, "together with land under and adjoining said house as now used with it," the question, at the trial of a writ of entry to recover the premises, whether certain land, some of which is covered with buildings and some contained in a passageway, and all of which adjoined the house-lot when

the deed was made, was then used with the house and so included in the description in the deed, is one of fact for the jury.

If a dwelling-house is conveyed, "together with land under and adjoining said house as now used with it," the tenant, at the trial of a writ of entry to recover the premises, is not entitled to a ruling which would limit the description in the deed to "land used as a yard with the house," or to a ruling that the deed did not convey "any land or buildings which were then used or designed to be used by tenants."

A party to an action, who has not changed his condition in consequence of any waiver or election or other act or conduct of the opposite party, is not entitled to invoke the doctrine of estoppel.

If, at the trial of a writ of entry to recover land conveyed to the demandant, through a third person, by her husband, her acts and conduct after his death, shown by the evidence, taken most strongly against her, amount to no more than a practical construction by her of the conveyance under which she claims, this aspect of the case is properly left to the jury; and the tenant is not entitled to rulings that the demandant was prevented from recovering any portion of the demanded premises by an election to take less land than was conveyed to her, or by an estoppel by reason of her conduct after her husband's death.

At the trial of a writ of entry to recover premises in a city conveyed "together with land under and adjoining said house as now used with it," evidence of a change in the business condition of that part of the city in the immediate vicinity of the demanded premises is immaterial, and rightly excluded.

At the trial of a writ of entry to recover land conveyed to the demandant, through a third person, by her husband, evidence as to the real estate for which he, and, after his death, his estate were assessed, is properly excluded.

An exception to the refusal to set aside the verdict and to order a new trial of a writ of entry, which raises no new question, will not be sustained.

WRIT OF ENTRY, dated November 14, 1894, to recover possession of a parcel of land in Haverhill. Plea, *nul disseisin,* with a specification of defence, disclaiming as to a portion of the demanded premises. A plan of the premises is printed on the opposite page. Trial in the Superior Court, before *Bishop,* J., who allowed a bill of exceptions, in substance as follows.

The demandant claimed title from Andrew W. Hammond, her deceased husband, under the following instruments:

1. A quitclaim deed in common form from Andrew W. Hammond to C. Howard Poor, dated September 12, 1877, in which the description was as follows; " The brick house now occupied by me on the westerly side of How Street, in said Haverhill, being house No. 12 on said street; together with all the appurtenances thereto belonging, and the furniture and household goods now being therein; together with land under and adjoining said house as now used with it"; and which purported to convey the premises to Poor upon a trust expressed as follows:

"To convey the same to my wife, Mary L. Hammond, for her use from my decease so long as she remains my widow."

2. A quitclaim deed in common form from C. Howard Poor to the demandant, dated September 12, 1877, in which the description was as follows: "The brick house and now occupied by said Andrew W. Hammond and family on the westerly side of Emer-

son Street, in said Haverhill, being house No. 12 on said street; together with all the appurtenances thereto belonging, and the furniture and household goods now being therein ; together with land under and adjoining said house as now used with it"; and which purported to convey the premises to the demandant to hold from and after the decease of her husband, so long as she remained his widow.

3. A lease from Andrew W. Hammond to Benjamin F. Brickett, dated July 29, 1878, of "that brick house with land under and adjoining the same as used with it, situate on the west side of How Street in said Haverhill, and being numbered No. 10 How Street; to hold for the term of the natural life of my wife Mary L. Hammond, from the day of date hereof, yielding and paying therefor the rent of one dollar per year"; and containing the usual covenants. On the back of the lease the following indorsement, dated July 29, 1878, and signed by Brickett, was made : " Know all men by these presents, that I, Benjamin F. Brickett, lessee within named, in consideration of one dollar to me paid by Mary L. Hammond, the receipt of which is hereby acknowledged, do hereby assign, transfer, and set over unto said Mary L. Hammond the within written lease, the estate therein conveyed, and all my interest therein, subject to all the covenants therein contained."

4. A deed from C. Howard Poor to the demandant, dated August 2, 1894, in which the description was as follows: " All the real estate which was conveyed to me on said 12th day of Sept., 1877, by said Andrew W. Hammond by his deed duly recorded as aforesaid"; and in which deed Poor referred to the deed from Andrew W. Hammond to himself first mentioned, and to his own deed to the demandant, and recited that in his deed to the demandant the premises were by mistake described as No. 12 Emerson Street, instead of No. 12 How Street, and that the present conveyance·was made for the purpose of correcting such error, and effectually executing the trust declared by that deed.

Edward H. Hoyt, called as a witness by the demandant, testified, among other things, as follows: " Am a grandson of Andrew W. Hammond. Have been familiar with the premises in question nearly all my life. Have seen the plan exhibited, and

understand it. Andrew W. Hammond lived in the house No. 10 How Street. He kept a horse and carriage in the stable right behind the house, in the building marked 'Stable' on the plan. The three buildings marked 'Woodhouse,' 'Privy,' and 'Stable' were all connected at the time of his death the same as now. The building marked 'Woodhouse' I think he used to put his carriages in. From the time when the Hammond Block was built until the death of Mr. Hammond, in 1879, he used that for a toolhouse, and had a bench in there; don't think any of those buildings or premises were rented after the block was built. He used the passageway in the rear of the block, and that between the outbuildings and the house, to drive into his stable."

On cross-examination, the witness testified as follows: "Don't think he was accustomed during the last years of his life to keep materials for repairing his various buildings in these back buildings. He used that shop as a general workshop; other people did n't use it. While my grandfather was living, to the best of my knowledge, I will say that the buildings were not let. He used them himself. He kept his horse in the stable, and he used the woodhouse and privy, and he used the toolhouse, and he had a bench. The stores in the Hammond Block are owned by different persons. All the stores have doorways opening on that passageway unless they have been stopped up. The open land between the buildings has been kept open always as a means of access to all these buildings."

Edward H. Livingston testified for the demandant as follows: "Have been familiar with the premises in question since 1872. Understand the plan. Mr. Hammond lived in the brick house north of the passageway with his family all the time I was acquainted with him. He died January 30 or 31, 1879. He owned a horse and carriage all the time I knew him, and there was one kept there by him at the time of his death. He occupied the stable up to 1876, and up to 1875 or 1876 he occupied the privy, that came next. Then this was his woodhouse, and his carriage run right in. The other building used to stand on the corner of How and Merrimack Streets. It was where it now is when I hired the west store in the Hammond Block of him. From the time I hired the store of him in 1872, and especially in 1877,

1878, and 1879, the building which stood directly behind my store was used by Mr. Hammond for a storehouse, to store old lumber or any such thing as that. Nobody occupied it but him. Don't recollect of his having any workshop in there. He occupied the driveway here back from the street. The space between the wooden house and No. 10 was used as his clothes yard. The building marked ' Privy ' he tore everything out, and had it one building the same as the woodhouse. I now recollect the number of the house where he lived as No. 10. No. 12 was a two-tenement house."

On cross-examination, the witness testified as follows : " Mine was the store next to the hotel on the west end. The driveway and the building stood right back of my store. Had to use the driveway to get my coal in. There was a front door in the wooden building marked ' Toolhouse' facing my store. Did n't have a key to it unless I got one from Mr. Hammond. No one in my employ did. Kept no goods in that building which were usable. The wooden house No. 8 How Street was generally called a boarding-house, occupied by tenants. It had an entrance next Hammond Block, at the east end near How Street. To get into it they used the passageway in the rear of the block. Think the occupants of the boarding-house hung their clothes on lines stretched from No. 8 to the building marked ' Toolhouse.' Where the privy stood was all placed into one building. That place was used as a stable and carriage-house, harness-house, and for other little things that he might put in there. I know Mr. Hammond kept one carriage, and he had an old wagon. The buggy carriage he kept for his private use ; kept it right south of space marked ' Privy.' There was a door there opened both ways."

The demandant testified, among other things, as follows : " Was married to Mr. Hammond, May 5, 1875. He resided at No. 10 How Street. It is a brick house, has only one front entrance. Resided there from my marriage until the time of Mr. Hammond's death, January, 1879. During that time he kept a horse and carriage in the building marked ' Stable.' The carriage was generally run into the next building. He kept his horse there also. This driveway there, this yard, also this passageway in connection with those stables, were used by Mr.

Hammond exclusively with No. 10. He kept wood in the build-
ing marked 'Woodhouse,' as well as his carriage and wagon.
The building marked 'Privy' as a separate building was taken
in with the rest, and at the time of his death was all used as one
building. The building marked 'Toolhouse' was used for stor-
ing any part of the furniture that we used to dispose of from the
house. No other person occupied or used any of those buildings.
They were never rented. The area where lines are strung be-
tween No. 8 and No. 10 was used with the house No. 10 for
drying clothes, and the passageway wholly as a private passage-
way. That other passageway was used for wagons, and to convey
things to the house, anything that he wished to convey to those
buildings and the stables. Did n't rent the stable or any of
those buildings after my husband's death; they remained vacant.
I went to live in Boston soon after my husband's death, and
have remained there ever since. Various parties have occupied
house No. 10. I rented it through an agent to persons who have
occupied it and paid rent to me. Have been in Haverhill quite
frequently since my husband's death. Know that the stables
have been occupied; not through my leave or license, because it
was taken right out of my hands."

On cross-examination, the witness testified as follows: "Have
been somewhat familiar with the premises shown on the plan
since I first went to Haverhill. My recollection is that those
(rear) buildings, except that corner building (marked 'Tool-
house') were there on that same land. That building marked
'Woodhouse' and 'Privy' was used with the house when I first
recollect it, with the homestead and the stables. From the first
that I kept house there, we used that (space between No. 8 and
No. 10) for a clothes yard. There were posts and lines there.
At the time I lived at No. 10, No. 8 was used as a boarding-
house; the occupants hung their clothes in space north of No. 8,
by permission of Mr. Hammond only; it never went with house
at all. Mr. Hammond never to my knowledge occupied any
other house than No. 10. We were living there at his decease.
Knew that Nathan Longfellow was special administrator of my
husband's estate. Understood that he was taking charge of the
property that belonged to the estate. All except the portion I
pointed out (on the plan) that I claim there. If he took charge

of it, it was without my consent.   I believe it was Mr. Abbott who succeeded to the care of the Hammond property after Mr. Longfellow gave it up.   He took charge of the Hammond Block and No. 12 with the land; No. 8 he took charge of.   I took charge of this portion myself, and this house (10).   I was n't allowed to take charge of the buildings in the rear.   They were taken from me by Mr. Abbott.   I never called on him with reference to the property.   Never made any demand on him personally for any portion of the property, or through other parties, until I sent my counsel in this case, about a year and a half ago, or a year.   I knew that those rear buildings were being occupied for various purposes while Mr. Longfellow had charge of them; that people were keeping horses in them, and such things, but they were there by no right.   I did n't make any complaint to Mr. Longfellow on account of it.   Was n't well enough to assert my rights, or take any action of the kind, but I knew the time was coming when I should.   I first heard of the conveyance of the property to Mr. Abbott about three or four years ago.   I knew that he had let those rear buildings, and was collecting rent from my property.   Don't know anything about his making repairs.   I was n't making any repairs.   Did n't communicate with him when I first heard he had bought the property, because I had n't engaged counsel.   Thought it was necessary to have counsel · before telling Mr. Abbott that I claimed it.   Knew, when he ordered my rent not to be paid to me, that it was useless to communicate with him.   I did not really think he had bought the property.   I began to pay taxes in Haverhill after my husband's death in 1879.   Supposed I paid the Emerson Street property, and also this property; paid my taxes year after year.   Supposed I was paying taxes on the whole of this property. Did n't know what my tax bills covered.   Knew I was getting no income from it, and that somebody else was getting income from it.   Mr. Jenness, who was present when the deeds and lease were made, was a lawyer in Haverhill.   After Mr. Hammond's death I engaged him to rent my house No. 10 How Street.   Did n't employ him for any other purpose.   Did n't give him any instructions as to the outbuildings and other places which are in controversy in this suit; simply to rent the house.   I did n't wish the stable and other buildings rented then; I wanted them to

remain as they were. I supposed I had a right to have my property remain as I liked when I went to Boston. I allowed Mr. Andrew F. Hammond to keep his horse in the stable before he died. I wished it to remain as it was when Mr. Hammond died. Should think it was about a year or two before I tried to rent it; then I employed Mr. Hoyt to rent it for me. Then Mr. Abbott notified the tenants to pay the rent to him, and not to Mr. Hoyt, and that is how it slipped from me. My mind never changed at all."

Frank Morrill testified for the demandant as follows: "Am familiar with the premises in question. Mr. Hammond kept a horse and carriage there in the building marked 'Stable'; in the building marked 'Woodhouse' there was a bench and tools, also a kind of old wagon. He also kept wood in there. The building marked 'Privy' is not a separate building, it was all one building during the years 1877, 1878, and 1879. During that time the building marked 'Toolhouse,' etc., was n't much used for anything; was n't rentable, so Mr. Hammond used it to keep planks and boards in there. He used to go in there and work sometimes. Nobody used the building but Mr. Hammond, to my knowledge, except once or twice I think I borrowed the key and put in a broken table. There was a clothes line across from that building to the house No. 8, with a pulley arrangement; at one time Mrs. Hammond's clothes were hung to dry in the space between the house No. 8 and the house No. 10. There was a pair of stairs on the outside of the building marked 'Woodhouse,' next to the one marked 'Toolhouse,' etc., and Mr. Hammond used to keep some paint boxes in the upper part."

On cross-examination, the witness further testified as follows: "Have seen Mr. Hammond working in both of those buildings, one marked 'Toolhouse,' etc., and one marked 'Woodhouse.' The bench was in the one marked 'Woodhouse.' Don't think the buildings were fitted up as workshops; they were n't worth fitting up. The building marked 'Toolhouse,' etc. was never used in connection with the Livingston store while I worked there."

Edward A. Hammond testified for the demandant as follows: "Andrew W. Hammond was my father. He resided in Haverhill, in the house known as No. 10 How Street, sometimes as

No. 12. He occupied the house No. 10 on the plan, and the driveways, garden, and well appurtenant thereto, for more than forty years as a homestead. The stable, privy, storehouse, toolhouse, workshop, and woodhouse were used by him for a great many years in connection with the same. I was familiar with the use made by him of the premises No. 10 How Street, and land under and adjoining the same, as shown on the plan, during the years 1877, 1878, and prior thereto. All the land included in the irregular line drawn by me on the plan was used in connection with the house, including the land now covered by the outbuildings referred to at the time of my father's death, and for more than forty years prior thereto. My father used in connection with the house all the land around which I have drawn an irregular line, together with the workshop, stable, storehouse, toolhouse, woodhouse, privy, well, private way from How Street adjoining the north of the Hammond Block, as indicated in the plan, and running up to each of the outbuildings I have mentioned, and to his residence as I have indicated on the plan. There was a driveway or passageway used with the house. It was located just north of and adjoining the Hammond Block, as indicated on the plan, corner of Merrimack and How Streets; the entrance was from How Street and on the southern end of the premises, and running up to the stables and the rear of his residence."

On cross-examination, the witness further testified as follows: " My father generally kept a horse. He might have been without one for a short time, but he always had stables connected with his house. The buildings shown on the plan referred to were in about the same positions as shown there at my father's death and for a great many years before. The house in which my father lived had no number on the door for more than twenty-five years; it was sometimes called No. 10, sometimes No. 12, and I think also sometimes No. 8."

James P. Dearborn testified for the tenant as follows: " I first became acquainted with the property in question in 1861. When Mr. Hammond built the block in 1871 or 1872 he moved the building marked ' Woodhouse ' and ' Privy ' north about fifteen or twenty feet, I should say, to make room for the building I was occupying to be set in there [building marked ' Toolhouse,'

etc.]. Those buildings after he moved them back were not used for much of anything. Sometimes the doors were open, and sometimes they were shut. Have seen people from Livingston's store go in and out of those buildings. Have never seen them carrying anything between the buildings. Mr. Hammond used to keep a horse and wagon in the building marked ' Stable.' "

On cross-examination, the witness further testified as follows : " After the Hammond Block was built, I could n't say these old buildings in the rear were let : generally the only occupant was Mr. Hammond."

Mrs. U. D. Mitchell testified for the tenant as follows : " I hired house No. 8 on plan of Andrew W. Hammond from November, 1877, to May, 1878. Mr. Hammond had clothes posts put up for me north of house, substantially as they are now, and I put out lines, and hung my clothes there to dry. Nobody else used it. There was a back door with a flight of stairs outside leading up to it, and a basement door under it. To reach the back door and basement door we passed through passageway south of the house next to the block."

Orlando Brown testified for the tenant as follows : " Knew Andrew W. Hammond and was acquainted with the premises in question. The buildings marked ' Woodhouse ' and ' Privy ' and the one marked ' Stable ' were all moved towards the north together to make room for the one marked ' Toolhouse,' etc. After Mr. Hammond's decease the building marked ' Stable ' was occupied by Mr. Ramsay. He kept a team there. Think he may have been there nearly a year : he was also a tenant in the Hammond Block. I think Mr. Andrew F. Hammond had a horse there a while. To the best of my recollection, the building marked stable must have come down nearly opposite the end of the house (No. 10) before it was moved back." .

On cross-examination, the witness further testified as follows : " Don't know of anybody occupying those old buildings in the rear from the time the tenants who were in them when they were moved back went out, except Mr. Hammond, up to the time of his death. Knew Mr. Hammond kept a horse there during his lifetime, up to the time of his death ; he occupied the stable and the woodhouse with his horse and carriage. There was a driveway came in there to drive up to his stables, and this

land here back of his house. Up to 1872 Mrs. Hammond used the space north of No. 8 where the clothes lines were strung for her clothes yard. Don't know who has occupied it since then."

Nathan Longfellow testified for the tenant as follows: "Was familiar with the property shown on the plan; at one time was special administrator of the estate of Andrew W. Hammond. I took possession of all the property shown on the plan with the exception of No. 10 How Street. Ascertained who I had for tenants, and collected the rents. Buildings not occupied I rented if I could. Found a tenant in No. 8, and collected rents. Land north of No. 8 was used for clothes yard by tenant of No. 8. I let the building marked 'Stable' to Mr. Ramsay; he also occupied in the block. Occupied the stable from June 1, 1884, to December 1, 1884, and paid rent to me. Andrew F. Hammond had some occupancy of building marked 'Woodhouse'; he did n't pay me anything. I let him stay there. No other person occupied any portion of the building marked 'Woodhouse' and 'Privy' to my knowledge. Let the lower part of building marked 'Toolhouse,' etc. to Mr. O. A. Smith for a stable. It was not occupied when I took possession. Let one or two rooms upstairs to a couple of gentlemen, and they stayed there two months. Mr. Smith occupied from August 1, 1881, to August 1, 1884; paid rent all the time. Mr. Smith was at the same time hiring a store in the block. Those buildings were all open, except upstairs, when I took possession. There was a flight of stairs on the south end of the one marked 'Woodhouse,' and I went up those and unlocked the door to gain entrance. I found a carpenter's bench at one side, and the floor covered with shavings and chips, as though some one had worked there. I met with the demandant in house No. 10 very soon after I was appointed. I told her Mr. Jenness had sent me in regard to getting a tenant for her house, and I wished to know what it was. I was then in the real estate business, letting houses. She told me what the house consisted of; said she wished to retain the attics to store her furniture until she removed it. She did not at that time say anything to me in reference to the other buildings. Do not recollect that she pointed out any privileges in the other buildings that went with the house No. 10."

Emma M. Drinkwater testified for the tenant as follows: "I

occupied house No. 8 as a tenant from the spring of 1878 about three years. Hired of Andrew W. Hammond. Used the clothes yard directly north of No. 8. Mr. Hammond told me it was for me. Nobody else occupied it while I was there. While I lived in No. 8, I saw some occupation of buildings in the rear by different ones. It was before the decease of Mr. Hammond. I saw Mr. Livingston carrying things in and out there. Other people were passing in and out more or less. Hammond Block was then occupied by stores, liquor saloons mixed in. Should say the building marked 'Woodhouse' was open, and people passing in and out more or less all the time. In some instances they came from Hammond Block. I was living at No. 8 when Mr. Andrew W. Hammond died. I remained in No. 8 after Mr. Longfellow took charge. Mr. Ramsay occupied the buildings marked 'Woodhouse' and 'Stable' a while. Mr. Smith occupied one marked 'Toolhouse,' etc. There was a painter in the second story of the building marked 'Woodhouse' for a while during Mr. Hammond's life, when I lived at No. 8."

Hannah S. Stickney testified for the tenant as follows: "Resided in house No. 12 How Street, in about 1875, 1876, and 1877. Andrew W. Hammond was my uncle. Knew that he kept his horse in building marked 'Stable.' Could n't particularize about other rear buildings. They were open apparently. Mr. Hammond was in and out, and my husband with him. Then other people lived in his tenements. Knew Mr. Livingston then, who occupied a store in the block; saw him in those buildings. Have seen things taken in and out of those buildings frequently. Don't know of my uncle's using other rear buildings except the stable for any special purpose; knew he used them all."

The tenant testified as follows: "Am acquainted with the property shown on the plan. Did not become familiar with the premises until the decease of Mr. Hammond, in January, 1879. Was retained shortly after Mr. Hammond's death to prove the will. When I became acquainted with the property in 1879 it was occupied by tenants, except what Mr. Hammond himself had occupied. Hammond Block, from the way in which it was built and the business conditions prevailing at the time, was occupied largely for liquor saloons. After the will was established in the spring of 1885, I examined the property

somewhat minutely preparatory to taking charge of it for the trustee. I found Mr. Longfellow in charge of all the premises shown on the plan except house No. 10, and in addition to that, of all the other real estate which belonged to the estate of Andrew W. Hammond. The land was all connected as one tract, that is, without any intervening ownership. I took charge of the same property, except the two middle stores in the Hammond Block, which were given by Mr. Hammond's will to his two daughters, and excepting house No. 10, with the land under and adjoining it [naming certain limits]. There were also the various privileges connected with that house which I never undertook to interfere with. The well has been used by tenants of No. 10, if they chose, as well as tenants of the other buildings, without any objection on my part. The land within the limits I have mentioned, with house No. 10, amounts to about 2,000 square feet, including what the house stands on. The path on the south side of the house and the well on the back side, with the amount of land, determined me as to the limits. When I took possession, No. 8 was occupied as a boarding-house; No. 10 was occupied by tenants of Mrs. Hammond. A Mr. Page was occupying the building marked 'Woodhouse' and 'Privy' as a stable. The portion of land between the block and what is marked 'Toolhouse,' etc., was not used then, and had not been used at all, for passage purposes, because nobody had occasion to go in except the occupants of the store immediately in front of it. I do not think I had repairs made on the building shown on the plan, except No. 8 and No. 12. There were considerable repairs and changes made on the old buildings in the rear, all of them. I did not bear the expense for the estate of any of them. Mr. Page and Mr. McDonald have paid rent to me in addition to making repairs. Mr. Ray has not paid except by making repairs. When I called on Mr. Page for rent, he made some objection to paying; said he did n't know but he should have to pay it to Mrs. Hammond. I told him that he would have to pay it to me, that I was representing the trustee. He did not say that he represented Mrs. Hammond or spoke for her at all. The matter was fixed up at the time, and he paid rent to me and never made any further objection. Neither Mrs. Hammond nor any one else, except as I

have stated, ever said anything to me with reference to that
matter before the commencement of this action. I purchased
the property in the fall of 1891, and continued in possession of
the property, and gradually notified the tenants that I was the
owner; changed the rent receipts to my name. At the time
I bought the property neither Mrs. Hammond nor anybody for
her had claimed or stated to me that she claimed any more
than what she was having, and I knew what she was having.
In addition, I had looked at the assessors' books to see what
she was taxed for in the city of Haverhill. I saw what had
been assessed to her, and what taxes she had paid, from the
time of Mr. Hammond's death in 1879 to the time I purchased,
and, having heard no question raised about it by anybody, I
went upon that knowledge in buying. I saw Mrs. Hammond,
within a few weeks after I made the purchase, in Boston, and
told her I had purchased the property, including the remainder
in the Emerson Street house which she had by an ante-nuptial
contract. I suggested an exchange of my interest in the Emer-
son Street property for her interest in the How Street property,
which she declined to consider. Then I suggested depositing
enough money to yield her whatever income she was getting
from the How Street house, speaking of it in that way. She
said, ' You know there is some land.' I said, ' Yes, but it is not
in shape to be of any use to you that I can see.' She declined
that proposition also; said she would consider nothing but an
outright sale, and would have to consult her lawyer about that,
and would then let me know what she would do. I heard noth-
ing further from her until in 1894, when her present attorney
notified me of her claim. Neither she nor any one who pro-
fessed to represent her up to that time had given me any notice
of any claim which she made to the land which she is now de-
manding. From the time I took charge of the property all the
tenants in the block occupied the passageway north of the
block, to a great extent, by things which they set out there,
as well as driving in to their back doors. There is a sign,
' J. Peterson,' on the south end of the building marked ' Wood-
house ' still. At the time when Mr. Hammond died there was n't
any business in the Hammond Block which made a call for those
old buildings in the rear for the tenants in the block, except
now and then one."

The demandant, recalled, testified on cross-examination as follows: "I intended, from the time Mr. Abbott took possession there, to assert my rights to the buildings. Considered them my buildings. Authorized Mr. Hoyt to let them. Have been debating with counsel and agitating it since. Had definite intention of asserting my rights. Partly remember conversation which Mr. Abbott has testified to after his purchase of the property. Had but very little conversation with him; was not prepared to make any conversation with him in regard to the matter at all. Anything that was to be said would be said by my attorney. Intentionally refrained from saying anything more to him. Have n't married since the death of my husband."

It was admitted by the demandant that the tenant was the owner of the demanded premises, and entitled to present possession thereof, subject only to the estate and rights of the demandant.

It appeared that, in 1871 or 1872, the building marked M was moved to its present position from Merrimack Street, and the buildings marked F, D, and C were moved northerly to make room for M. The tenant offered evidence of a change in the business condition of that part of Haverhill, in the immediate vicinity of the demanded premises, directly after the moving of these buildings; namely, that the shoe industry located on Merrimack Street became depressed, and that by reason thereof there was less call than was expected for the rental or use for business purposes of buildings situated as C, D, F, and M were, as tending to account for the non-occupancy or partial occupancy of these buildings for business purposes, and as bearing on the question whether the buildings were designed for use or were used in connection with the dwelling-house of Andrew W. Hammond. The judge excluded this evidence, and the tenant excepted.

The tenant offered in evidence transcripts of the books of the assessors of taxes of Haverhill, showing the real estate for which Andrew W. Hammond was assessed in 1878, and for which his estate was assessed in 1879, and for which the demandant was assessed for the years 1879 to 1894, both inclusive. The demandant objected to the admission of this evidence. The judge admitted the evidence as to the real estate for which the demand-

ant had been assessed in the years named, and refused to admit that as to the real estate for which Andrew W. Hammond was assessed in 1878, and his estate in 1879; and to this refusal the tenant excepted.

The tenant requested the following instructions to the jury:

" 1. The demandant is not entitled to judgment against the tenant.    2. The tenant is entitled to judgment against the demandant.    3. The demandant did not take any estate in any portion of the demanded premises under the lease from Andrew W. Hammond to Benjamin F. Brickett, dated July 29, 1878, and assigned to her.    4. As matter of law, the deed from Andrew W. Hammond to C. Howard Poor, dated September 12, 1877, and the deeds from Poor to the demandant, dated September 12, 1877, and August 2; 1894, did not convey to the demandant any interest in any building or the land under it, except the house No. 10 How Street.    5. Upon the evidence presented, the deed given by Andrew W. Hammond to C. Howard Poor, dated September 12, 1877, and the deeds from Poor to the demandant, dated September 12, 1877, and August 2, 1894, did not convey to the demandant any interest in any building, or the land under it, except the house No. 10 How Street.    6. As matter of law, the lease from Andrew W. Hammond to Benjamin F. Brickett, dated July 29, 1878, and assigned to the demandant, did not convey to the demandant any interest in any building, or the land under it, except the house No. 10 How Street.    7. Upon the evidence presented, the lease from Andrew W. Hammond to Benjamin F. Brickett, dated July 29, 1878, and assigned to the demandant, did not convey to the demandant any interest in any building, or the land under it, except the house No. 10 How Street.    8. As matter of law, upon the evidence presented, the demandant is not entitled to possession of the wooden building marked D and F on the plan, or to possession of the land under said building.    9. As matter of law, upon the evidence presented, the demandant is not entitled to possession of the wooden building marked C on the plan, or to possession of the land under said building.    10. As matter of law, upon the evidence presented, the demandant is not entitled to possession of any of the land marked O on the plan.    11. As matter of law, upon the evidence presented, the demandant is not entitled to posses-

sion of any portion of the parcels of land marked E, G, H, and L, in addition to that which was in her possession at the date of her writ. 12. The demandant is not entitled to any rights in the land included in the passageway in the rear of the Hammond Block, except a right of way to and from the house No. 10 How Street. 13. The demandant is estopped to claim any portion of the demanded premises in the possession of the tenant, because she has knowingly permitted the tenant to expend money upon them, and because she has kept silence as to her own title when it was her duty to speak. 14. The demandant, by her conduct in relation to the payment of taxes, and by her acts of occupation, elected what portion of the demanded premises she would claim under the conveyances to her, and is estopped to claim any additional portion. 15. The description of the premises in the conveyances under which the demandant claims title to the demanded premises being indefinite, it was her duty to elect what property she would claim under such conveyances; and having by her conduct and occupation taken the house No. 10 How Street, with 2,000 square feet of land, she is estopped to claim any other portion of the demanded premises. 16. The deed from Andrew W. Hammond to C. Howard Poor, dated September 12, 1877, and the lease from Andrew W. Hammond to Benjamin F. Brickett, dated July 29, 1878, would only include land used as a yard with the house No. 10 How Street, and would not include land used as a passageway to the house No. 10 How Street and other buildings. 17. Neither the deed to C. Howard Poor nor the lease to Benjamin F. Brickett conveyed any interest in the land included in the passageway in the rear of Hammond Block, except a right of way. 18. Neither the deed to C. Howard Poor, dated September 12, 1877, nor the lease to Benjamin F. Brickett, dated July 29, 1878, conveyed any land or buildings which were then used or designed to be used by tenants."

The demandant requested the judge to instruct the jury as follows:

" There is no evidence in the case from which the jury can find that the demandant ever elected to take or hold as the granted premises any specific portion of the demanded premises less than the amount now claimed by her, which can be set off or described by metes and bounds."

The judge refused to give the first eleven rulings requested by the tenant; and the tenant excepted. As to the remaining requests by the tenant, and the request by the demandant, the judge instructed the jury, among other things, as follows:

"The deeds in question and the lease use this language, 'land under and adjoining said house as now used with it,' that is, according to the proper meaning of the words, land under and adjoining said house used now in connection with the use of the house. In the first place, was the house in which Mr. Hammond then lived No. 10 or No. 12? It is agreed that the street mentioned in the second deed was the wrong street, and that the street on which Mr. Hammond lived was How Street, and not Emerson Street. Much of the evidence is to the effect that Mr. Hammond did not live in No. 12, but did live in No. 10, and there is no doubt that he intended to convey the house where he lived, and it will be your duty to determine in which of these houses, No. 10 or No. 12, he lived.

"The next question is, how much land outside of the house was properly included in that description? That phraseology has given rise to the controversy here, and the meaning of the question is this: At the time when those deeds were given, and the next year when the lease was given, how much land outside of the exact limits of the house did Mr. Hammond use in connection with the use of the house? The demandant says that much of it shown on this plan was so used; that a stable, the places marked 'Privy' and 'Woodhouse,' and the other house near Hammond Block and the passageways, were so used. The tenant says that these were not so used. . . . Some evidence has been introduced as to whether other persons at this time were using these buildings in the rear as tenants. Property which a person lets, situated as this is, would be used for a different purpose from that use and personal occupation which would be connected with a house where a person lived. A piece of property rented by Mr. Hammond would not be property used by him in connection with the house where he lived.

"The tenant further appeals to the practical construction which he says has been put upon the matter by the demandant. The tenant says that these were deeds and a lease which contained a conveyance of something about which the minds of the

parties met, that the language is indefinite, and that the construction which the demandant has put upon what was conveyed by these instruments is indicative of what she understood was conveyed; that the demandant only took the house and a small amount of land around it. The demandant says that is not so, and her counsel argues that she did all that a woman under the circumstances could be called upon to do. The tenant says that the demandant paid taxes upon a certain limited quantity of land, 2,000 feet, and no more; that the tax lists are open to everybody, and she knew, or ought to have known, that what she paid taxes upon was less than what she now claims. The demandant says that she did whatever she, under those circumstances, ought to be called upon to do, that she paid her tax bills when they came in, that she did not examine, and was not under obligation to examine, how many feet were included in those bills. These are questions of fact for you, that is, they are incidental questions bearing upon the main question of what was conveyed by those instruments, the language of the instruments being indefinite and obscure, and that depends upon what land adjacent to the house was used with it at that time. However much subsequent events may throw light upon past ones, and whatever inferences you may draw from any evidence in the case, the question is not what was the subsequent use of those buildings, but what was the use of the buildings at that time by Mr. Hammond?

" I am also asked to speak to you in regard to an election by the demandant to take a certain piece of this property for her own. There is no evidence in the case showing that the demandant ever elected to take or hold as the granted premises any specific portion of them less than the amount which she now claims, which she set off, or which she specifically claimed by any specific description, the evidence which has been introduced, and which is sought to be availed of in regard to the demandant's action not being of that character, but being of a more general character as affecting her rights and her claims. The claim is on the part of the tenant, that by the demandant's conduct, by the lapse of time which intervened between the date of these instruments or the death of Mr. Hammond and the time she brought her suit without specific and clear claim

to the property on her part, by her paying taxes on a limited amount, by various statements which she made, as well as of the absence of a claim for a larger amount, she indicated that the understanding on her part of what was conveyed by these instruments gave a practical construction by her to these deeds that they conveyed a less amount than she now claims; on the other hand, as I have already stated, she says that she has done nothing inconsistent with making a full claim now. These are the claims upon that question upon the one side and the other."

And the tenant excepted.

At the close of the charge, at the request of the tenant, the judge added that in what had been said in the charge as to the tenant's claim that the demandant had put a practical construction upon the grant by her conduct, should be included the tenant's claim that he had expended money during the time upon some of this property, and that the demandant knew, or might have known, that fact.

The judge also, with the agreement of counsel, directed the jury to answer the following questions:

" 1. Was the house marked No. 10, or the house marked No. 12, on the plan submitted to the jury, the house occupied by Andrew W. Hammond, September 12, 1877, and referred to in his deed of that date to C. Howard Poor ?

" 2. Were any of the parcels marked on said plan A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, respectively land adjoining said house as used with it at the date of said deed, and at the date of the lease from Andrew W. Hammond to Benjamin F. Brickett, July 29, 1878 ; and, if so, which of said parcels ? "

To the first question the jury answered, " No. 10 was the number " ; and to the second question they answered, " C, D, E, F, G, H, L, N, O " ; and returned a verdict for the demandant.

After the verdict, the tenant was allowed to amend his plea by adding a specification of defence, that the demandant " is estopped in equity and good conscience to maintain this action, because that from the spring of 1879, the time when she claims she became entitled to possession of the demanded premises, until the fall of 1894, she knowingly permitted the tenant to expend money upon the premises, and because she kept silence as to her own title when it was her duty to speak ; and that the

demandant, by her conduct in relation to the payment of taxes, and by her acts of occupation, elected what portion of the demanded premises she would claim under the conveyances to her, and is estopped to claim any additional portion."

The tenant moved that the verdict be set aside and a new trial granted, on the ground that it was against the law and the evidence, and the weight of evidence. Subsequently, upon the suggestion of the judge, that otherwise the verdict would be set aside, the demandant relinquished all claim under the verdict to the portion of the demanded premises marked N on the plan. The judge then refused to set the verdict aside, and to order a new trial; and the tenant alleged exceptions.

*F. H. Pearl*, for the tenant.

*F. Hutchinson*, for the demandant.

BARKER, J. 1. The tenant's first exception is to the refusal to give the first eleven rulings requested by him. All of them were rightly refused. The first and second were in effect that a verdict should be ordered for the tenant, and this could not be done because upon the evidence the case was for the jury.

The lease of July 29, 1878, and the assignment of the same to the demandant, were both executed on the same day, and might be found to be parts of one transaction, in which the demandant's husband released to her, through Brickett as a mere conduit, the condition subject to which she held the premises under her husband's former deed. Such a release between the parties to a condition is valid. See Com. Dig., Condition (Q) 135. As under the lease the demandant might be found to have acquired a right to the leased premises during her own life after her remarriage, conditional upon such remarriage, the third request was rightly refused.

The requests numbered from four to nine inclusive all turn upon the contention that no land under any building but the dwelling-house occupied by Mr. Hammond as his home, and no building on such land, could pass by the deed of 1877, or by the lease of 1878.

But the language, " Together with land under and adjoining said house as now used with it," is a description which may include adjoining land covered with buildings, as well as adjoining vacant land, the description including and carrying all land

adjoining the dwelling-house which was then used with that house. The question is not whether land covered by a building can pass as a mere appurtenance to a residence.

The lands marked O, E, G, H, and L upon the plan were all lands adjoining the residence lot when the deed and lease were made, and upon the evidence the question whether they were lands then used with the dwelling-house was a question of fact for the jury, and the tenth and eleventh rulings were rightly refused.

The passageway in the rear of Hammond Block is the same land designated in the tenth request as marked O on the plan. Whether the demandant had in it any right except a right of way to and from the house depended upon whether it was included in the description of the deed and lease, and as this was a question of fact, the twelfth request was properly refused. The same considerations dispose of the seventeenth request, relating to the same passageway.

The sixteenth request attempts to read into the language of the conveyances restrictive words which would limit the description to land used as a yard with the house. As there is no such restrictive language in the deed, this request was properly refused. The rule that the actual use at the time of the conveyances was the test, disposes also of the contention on which the eighteenth request was founded, that neither instrument conveyed any land or buildings which were then used or designed to be used by tenants.

2. The thirteenth, fourteenth, and fifteenth requests relate to the question whether the demandant was prevented from recovering any part of the demanded premises by an election to take less land than was conveyed to her, or by an estoppel by reason of her conduct after her husband's death. The evidence was not such as to justify the giving of any of these rulings, and they were properly refused. Nor do we find any error in the rulings given upon this part of the case. There was no evidence that the tenant had changed his condition in consequence of any waiver or election, or other act or conduct of the demandant. On the other hand, the inference might perhaps be drawn that he bought for the purpose of testing the demandant's ownership. Nor was there any evidence that justified a finding that

the demandant had elected not to accept land conveyed to her. Taken most strongly against her, the demandant's acts and conduct amounted to no more than a practical construction of conveyances under which she claimed, and this aspect of the case was properly left to the jury.

3. The evidence of a change in the business condition of that part of the city in the immediate vicinity of the demanded premises was immaterial, and rightly excluded. It did not bear upon the question of the actual use of the land adjoining the house at the time of the conveyances.

4. The evidence as to the real estate for which Andrew W. Hammond was assessed in 1878, and for which his estate was assessed in 1879, was properly excluded. The facts that after his death the demandant was not, and that some other person was, assessed for land which she demands by her writ, were *res inter alios*, and irrelevant.

5. The exception to the refusal to set the verdict aside and to order a new trial must be overruled, as of course. It raised no new question.        *Exceptions overruled.*