GORTON-PEW FISHERIES COMPANY *vs.* JAMES E. TOLMAN &
another.

Essex.      November 8, 1911. — January 2, 1912.

Present: RUGG, C. J., HAMMOND, BRALEY, SHELDON, & DeCOURCY, JJ.

*Land Court,* Exceptions. *Way,* Private. *Easement. Devise and Legacy.*

On exceptions to a decision of a judge of the Land Court, where the bill of ex-
ceptions set forth all the evidence and stated that a decision of the trial judge
which contained findings of fact might be referred to, and where the findings of
fact were warranted by the evidence and by inferences that might have been
drawn therefrom, it was *held,* that such findings were conclusive and that this
court could not consider whether they were supported by the weight of the evi-
dence or whether a different inference could have been drawn from the facts.

The owner of a large tract of land, bounded northerly on a street and southerly on
a harbor, fenced off a portion of it which bordered on the street and used it for
homestead purposes, erecting thereon a house and stable and making a garden.
He used the remainder of the land for building purposes and constructed from
the street toward the harbor a private way, which he intended for use in con-
nection with all parts of his homestead property and also of his business prop-
erty and which was the only reasonable means of access to the stable and garden
lots. He then made a will, in the second clause of which he gave the "home-
stead . . . as now enclosed" to his wife, and, after clauses in which he completed
his testamentary dispositions, in a sixteenth clause he directed "that the garden
situate southerly of the dwelling house . . . shall be a part of the homestead given
my wife in the second item . . . and I do hereby devise said garden to my said
wife as a part of said homestead." One, who after the death of the testator
had acquired the homestead property by mesne conveyances from the testator's
wife, erected on a part of the house lot and on the stable and garden lots a
theatre, and claimed a right to use the private way in connection with it. *Held,*
that it was the intention of the testator to give to his wife with the land an ease-
ment of passage over the way, which was not restricted to the use of the gates
then in the enclosure nor to domestic purposes, but was to be left to be adapted
to the convenience and desires of occupants of the estate from time to time; and
therefore that her successor in title had a right to use the way in connection
with his theatre.

Discussion by SHELDON, J., of the law with regard to easements which, although
not expressly described in an instrument of conveyance, pass with the dominant
estate by implication because they are reasonably necessary to its use and en-
joyment, are open and continuous and are in use at the time of the conveyance.

PETITION, filed in the Land Court on July 23, 1907, for the
registration of the title to land in Gloucester fronting southerly
on Gloucester harbor and northerly on Main Street. The re-
spondents claimed the right to use a way through land of the

petitioner in connection with land owned by them fronting on Main Street and immediately east of the way and the land of the petitioner.

In the Land Court the case was tried before *Davis*, J. He found the following facts in substance:

In 1852 the land of the respondents and the greater part of that of the petitioner was included in a tract of pasture land, known as Trask field, which then was purchased by John Pew, a Gloucester merchant engaged in the fisheries. The field sloped up from Main Street, at which point it was low and springy, over a rocky incline, and thence dropped off to the harbor. On the water front, Pew built wharves and docks with a flake yard to the north thereof. Running from Main Street to the wharves near the west line of the Trask field, he built the way now in question, leaving, however, a narrow strip of land at the north-westerly corner for a store, now contained in a brick block, and for a yard and for fish flakes, and at the northeasterly corner a tract of land having a frontage of sixty-five feet on Main Street, a depth southerly along the way in question of three hundred and twelve feet, and a width on the southerly end of sixty-two feet, for a house lot, stable and garden comprising his homestead estate which is now the property of the respondents. This homestead estate he filled and graded, building a mansion house on the front part facing on Main Street, with a stable in the rear and a garden which he cultivated and in which he also had a hen house and yard. The portion of the lot on which the house was built was filled in so that the house stood above the street and way, with bankings and some ornamental shrubbery about it, and there was a wall surmounted by an ornamental fence along Main Street, with gates for foot passengers opening to walks leading to the front and back doors of the house, to the cellar doors and cellar windows, and to stone steps to the stable yard, and there was a wall surmounted by a similar fence along the way in question as far south as an embankment wall which was between the house and the stable. Back of the house the land made an abrupt drop to the stable. The embankment wall was surmounted by a low fence with a gate in it between the house and the stable and stable yard, and a flight of stone steps leading down from the house to the stable yard. A trellis and fence with an opening

in it separated the stable and stable yard from the garden. Access to the stable, stable yard and garden was had from the private way in question through a swing gate for teams opening on to a driveway to the stable yard and stable, located opposite the stable and large enough to admit a wagon, the opening thus made into the driveway being in a high slat fence which ran from the embankment wall around the west, south and east sides of the property now owned by the respondents. The fences above mentioned completely enclosed the house, stable and garden.

Pew lived in the house and occupied the whole of the premises now owned by the respondents as his homestead until his death. Until 1868 he kept in the stable a horse and carriage for his own use, and also at times one used in the firm business. In 1868 he had a runaway accident which lamed him for life, and thereafter he kept no horse. From then on the stable was used mostly for storage purposes, and in the stable yard and driveway were from time to time kept portable chicken coops. Access to the stable, stable yard and garden was, however, still had as occasion might require through the gates opposite the stable which opened upon the way in question. In going between his house and place of business, Pew sometimes came out his side door, down the stone steps to the stable yard, and thence out by the stable gate and down the way in question to the wharves. Sometimes, however, he went out through his front gate to Main Street and around by the store. As he grew older he used the stone steps and stable gate less and less. It appeared that the gates opposite the stable opening from the way were locked at times to prevent boys from getting into the yard to the magnolia and fruit trees, and that in the later years of Pew's life the use of the gates for any purpose was very infrequent; but the judge found that the gate was not permanently closed up. The use of the way so far as Pew personally was concerned in his actual occupation of the premises was largely discontinued, but there was no abandonment of the use of the way in connection with the premises or permanent interruption thereof.

In 1868 Pew bought additional land on Main Street adjoining the store on the west, and a brick block was erected covering that lot and the piece of the Trask field formerly occupied by the

store.   He also bought some house lots south of the store which fronted on an adjoining street called Vincent Street.   For many years and until his death the block and the wharf properties were rented by Pew to the firm in which he was the principal partner, and the way was in constant use in connection with the firm properties, constituting the principal means of access to the wharves and flake yards, and the only entrance to the side and back doors of the store and block and to a yard and small building back of the store.   Cottages were erected on the house lots which were rented to employees of Pew or of the firm.   The tenants used the way in question.   After 1879 the way was and now is defined on its west side by fences and a wall and the side of the brick block.   The way in question was always kept in repair by the firm, and the cost charged into the firm's expenses, along with rent, in their accounts with Mr. Pew.

In Pew's lifetime or at his death a driveway ten feet wide, as far as the stable yard and stable, could have been built from Main Street over the front lot now of the respondents, which was worth about $10,000, for about $150.   Such a driveway would have been very disadvantageous to the remainder of the house lot.   A way ten feet wide would not have been adequate for the development and use of the stable and garden lots, either for business purposes or for cutting up into house lots, and a way twenty feet wide running back into the garden for the development and use of the property would have cost from $750 to $900 and would have greatly impaired the availability, use and value of the garden lot by narrowing the lots into which the garden could have been divided.   The homestead estate at the time when Pew's will was made and at his death was in a residential and business neighborhood.

Pew made a will in 1876, by the second paragraph of which he left his "homestead . . . in said Gloucester as now enclosed" to his wife, and by the sixteenth paragraph he directed "that the garden situated southerly of the dwelling-house occupied by me . . . shall be a part of the homestead given my wife in the second item of the will, and I do hereby devise said garden to my said wife as a part of said homestead."   He died in March, 1890, and his will was proved.   His widow occupied the homestead, including the house, stable and garden, until her

death in December, 1890, when she devised it to her daughter, who occupied it for nearly ten years, and from whom it passed in 1900 to the respondents by mesne conveyances duly recorded, each containing the usual habendum clause "with all the privileges and appurtenances thereto belonging." The fee to the way and to the other land described in the petition for registration was devised to the testator's sons.

The respondents upon acquiring title levelled off the front land and erected a permanent wooden building used as a theatre and opera house, covering the middle portion of the property, including the southerly end of the house lot, the whole of the stable yard, and the northerly end of the garden, and having its stage entrances and only intended means of access by teams on and from the way in question. They removed the gates and the fence along the way. At the place where the gate opposite the stable formerly was located, the theatre building completely blocks entrance from the way to the property, except for the purpose of entering the theatre. The theatre building also blocks all access to the stable by horses or wagons. The respondents have used all the land between the house and the way in question, a width of from twenty-one to twenty-three feet, as an entrance for spectators from Main Street and have levelled it and covered it with cement for that purpose. The house and stable are still standing in their original location, and are in use by the respondents. In 1902 a cottage house was moved on to the southerly part of the garden lot by the respondents and is occupied by them.

The judge found as a fact that at the time the will was made and at the date of the testator's death, the only reasonable means of access to the stable and garden lots was by means of the way in question, and ruled that under the will of John Pew his widow took as appurtenant to the homestead and garden specifically devised to her under the above described second and sixteenth clauses of the will an easement of passage to and from Main Street for all convenient purposes in the land within the limits of the way in question, and that the respondents by mesne conveyances are now the owners of the estate so devised to her. A decree was ordered accordingly; and the petitioner alleged exceptions.

The bill of exceptions contained a recital of all the material facts in evidence and a statement that a decision of the trial judge's finding, which contained a detailed statement of facts found by him, might "be referred to."

*H. T. Lummus*, (*C. N. Barney* with him,) for the petitioner.

*C. A. Russell*, for the respondents.

SHELDON, J. No claim is now made that the respondents have any title to the fee of the roadway in question, or that they have any right of way over it by estoppel under the rules laid down in such cases as *Motley* v. *Sargent*, 119 Mass. 231, 236; *Lemay* v. *Furtado*, 182 Mass. 280; *McKenzie* v. *Gleason*, 184 Mass. 452; *Gould* v. *Wagner*, 196 Mass. 270; and *Downey* v. *H. P. Hood & Sons*, 203 Mass. 4. It is not denied that the fee of the roadway, subject to whatever rights of passage have been created therein, vested in the petitioner's grantors, the sons of John Pew, by the devise to them of his business property. *Cleverly* v. *Cleverly*, 124 Mass. 314. *Dudley* v. *Milton*, 176 Mass. 167. Nor do the respondents claim that they are entitled to a way by necessity strictly so called. The main question is whether upon the findings made by the judge of the Land Court, so far as those findings were warranted, he was right in ruling that under the will of John Pew his widow took as appurtenant to the estate specifically devised to her an easement of passage over this way from Main Street to her rear land.

By the second clause of his will, Mr. Pew devised to his widow his "homestead situate on the southerly side of Union Hill in said Gloucester as now enclosed." After other and various devises and bequests, he provided in the sixteenth article of his will that the garden southerly of his dwelling house should be a part of the homestead given to his wife, and added, "And I do hereby devise said garden to my said wife as a part of said homestead." This included the stable and garden lot, to which as well as the dwelling house it is now claimed that the way is appurtenant. The judge at the trial found as a fact, from the other facts found by him, that at the time the will was made and at the date of the testator's death the only reasonable means of access to the stable and garden lots was by the way in question. As this was an inference which could be drawn from those facts, the finding is now conclusive, and we cannot con-

sider whether it is supported by the weight of the evidence or whether a different inference could have been drawn from those facts.

Upon this finding and the other facts stated in the exceptions and in the decision of the Land Court which is referred to therein, it appears to us that the devise to Mrs. Pew was intended to include the right of way which has been mentioned. This depends upon the intention of the testator, as gathered from the language which he has used, considered in the light of the circumstances as known to him, and with the help of all the evidence available to show what those circumstances were. *Leonard* v. *Leonard,* 2 Allen, 543, 545. *Bagley* v. *New York, New Haven & Hartford Railroad,* 165 Mass. 160, 164. As the way was laid out by him over his own land and was afterwards used by himself and those with whom he was connected, we must look at its origin and history, at the manner of its use, and the purpose with which it was wrought for travel, so far as that purpose was manifested by its situation, the manner of its construction, and the use which he himself made and allowed others to make of it. These facts have been found with some detail; and from them it was certainly proper, if indeed it was not necessary, to draw the inference that Mr. Pew built and maintained this roadway for the purpose of affording convenient access to all the parts of his property abutting upon it, including the garden and stable lot in the rear of his dwelling house, as well as the wharves at the end of the way and the business property, both what he first owned and what he afterwards acquired, lying upon the other side of the way. It also could well be found, as manifestly it was found, that he continued to have this intention during his lifetime, and to use the way in conformity therewith. It was under these circumstances that he made his will, and in the first operating clause thereof after the appointment of his executors devised to his wife his homestead " as now enclosed." Then, after having almost completed his testamentary dispositions, his mind reverted to the provision made for his wife, and he seems to have feared that under the language he had used she would not take all that he desired her to have, or else to have resolved to make a more liberal provision for her; and he accordingly expressly devised to her the garden which he had used

in connection with the house. In this clause he omitted the limitation which he previously had made, that she was to take the property "as now enclosed." On the contrary, after giving to her in the rest of this clause his household furniture and other similar articles, he added the significant words, " intending that my wife shall have my said homestead and the personal property owned by me in the dwelling house of the same as it shall be at my decease." Here he plainly used the word " homestead " with a much broader meaning than he applied in the clause last quoted to the word " dwelling-house," and showed that he intended her to take the whole estate with the whole beneficial use and enjoyment thereof. But upon the findings of fact it appears that both when he made his will and when he died the possession of this easement was necessary to such full use and enjoyment. We cannot avoid the conclusion that he expected this roadway to be preserved just as he had laid it out, and intended to give to his widow an easement therein for the benefit of her house and land, as a part of his devise to her. *Otis* v. *Smith,* 9 Pick. 293. *Eliot* v. *Carter,* 12 Pick. 436, 442. *Hunt* v. *South Parish in Braintree,* 12 Met. 127. *Aldrich* v. *Gaskill,* 10 Cush. 155. *Melcher* v. *Chase,* 105 Mass. 125. *Kimball* v. *Ellison,* 128 Mass. 41. *Hammond* v. *Abbott,* 166 Mass. 517. *Dudley* v. *Milton,* 176 Mass. 167. *Millerick* v. *Plunkett,* 187 Mass. 97. But the court, in determining the rights of parties under a will, seeks first to ascertain the real intention of the testator, and will give effect to that intention unless prevented by some rule of property or fixed principle of law. *McCurdy* v. *McCallum,* 186 Mass. 464, 468. *Crapo* v. *Price,* 190 Mass. 317, 320. *Gray* v. *Whittemore,* 192 Mass. 367, 374. *Boston Safe Deposit & Trust Co.* v. *Blanchard,* 196 Mass. 35, 38. *Jewett* v. *Jewett,* 200 Mass. 310, 317. *Ware* v. *Minot,* 202 Mass. 512, 516.

There is no rule of property or principle of law to prevent us from carrying out the intention of this testator. On the contrary there is much authority for saying that if Mr. Pew had in his lifetime made simultaneous conveyances of his property in the same language that he used in his will, this roadway, visibly wrought on the surface of the ground, would have been subjected to an easement of passage in the hands of its grantee. *Scott* v. *Moore,* 98 Va. 668. *Phillips* v. *Phillips,* 48 Penn. St. 178.

*Cannon* v. *Boyd*, 73 Penn. St. 179. *Overdeer* v. *Updegraff*, 69 Penn. St. 110. *Liquid Carbonic Co.* v. *Wallace*, 209 Penn. St. 457. *Brakely* v. *Sharp*, 2 Stockton, 206. *Toothe* v. *Bryce*, 5 Dick. 589. *Goodall* v. *Godfrey*, 53 Vt. 219. *Mason* v. *Horton*, 67 Vt. 266. *McElroy* v. *McLeay*, 71 Vt. 396. *Dunklee* v. *Wilton Railroad*, 24 N. H. 489. *Butterworth* v. *Crawford*, 46 N. Y. 349. *Simmons* v. *Cloonan*, 81 N. Y. 557. *Baker* v. *Rice*, 56 Ohio St. 463. *Morrison* v. *King*, 62 Ill. 30. *Cihak* v. *Klerk*, 117 Ill. 643. *Irvine* v. *McCreary*, 108 Ky. 495. *Jones* v. *Sanders*, 138 Cal. 405. *United States* v. *Appleton*, 1 Sumn. 492, 502. See also the elaborate note to the case of *Rollo* v. *Nelson*, 26 L. R. A. (N. S.) 315, in which this question is exhaustively treated.

This court, like some others, never has gone to the full length of some of the decisions above referred to; but the underlying principle has been recognized and upheld. *Atkins* v. *Bordman*, 2 Met. 457, 464. *Leonard* v. *Leonard*, 2 Allen, 543, 545, and 7 Allen, 277, 283. *Oliver* v. *Dickinson*, 100 Mass. 114. *Adams* v. *Marshall*, 138 Mass. 228, 236. *Case* v. *Minot*, 158 Mass. 577. *Pearson* v. *Spencer*, 3 B. & S. 761. *Brown* v. *Alabaster*, 37 Ch. D. 490. *Milner's Safe Co.* v. *Great Northern & City Railway*, [1907] 1 Ch. 208. It has indeed been said that the rule is to be applied with some strictness and only where the easement which is sought to be maintained, though not expressly granted, is yet necessary to the enjoyment of the estate which has been conveyed. *Johnson* v. *Jordan*, 2 Met. 234. *Carbrey* v. *Willis*, 7 Allen, 364, 369. *Randall* v. *McLaughlin*, 10 Allen, 366. *Buss* v. *Dyer*, 125 Mass. 287, 291. *Cummings* v. *Perry*, 169 Mass. 150, 155. *McSweeney* v. *Commonwealth*, 185 Mass. 371, 374. *Warren* v. *Blake*, 54 Maine, 276. *Dolliff* v. *Boston & Maine Railroad*, 68 Maine, 173. *Stevens* v. *Orr*, 69 Maine, 323. *Hildreth* v. *Googins*, 91 Maine, 227. *Whiting* v. *Gaylord*, 66 Conn. 337. *Standiford* v. *Goudy*, 6 W. Va. 364. *Pheysey* v. *Vicary*, 16 M. & W. 484. *Worthington* v. *Gimson*, 2 El. & El. 618. But the necessity thus required is not an absolute physical necessity, but merely such a reasonable necessity for the use and enjoyment of the dominant estate as has been found to exist here. *Leonard* v. *Leonard*, 7 Allen, 277, 283. *Pettingill* v. *Porter*, 8 Allen, 1. *Oliver* v. *Pitman*, 98 Mass. 46, 50. *Schmidt*

v. *Quinn,* 136 Mass. 575, 576.  *O'Rorke* v. *Smith,* 11 R. I. 259.  *Kelly* v. *Dunning,* 16 Stew. 62.  But in such cases of the grant of an easement by implication, however much stress may be laid upon its reasonable necessity for the beneficial enjoyment of the estate granted, yet it is not, in the case of a way for example, strictly the necessity that creates the way, but the intention of the parties as shown by their instruments and the situation and circumstances with reference to which those instruments were made.  *Nichols* v. *Luce,* 24 Pick. 102, 104. *In re West 177th Street,* 120 N. Y. Supp. 354.  *Whitney* v. *Olney,* 3 Mason, 280.  *Pearson* v. *Spencer,* 1 B. & S. 571.  *Williams* v. *James,* L. R. 2 C. P. 577.

It is necessary also for the creation of such an easement that it should be open and continuous.  And it has been said that the easement of a private way, being used only at more or less frequent intervals and without any visible mark upon the ground, is non-continuous and therefore will not pass where other easements, continuous in their nature and being such as would be readily apparent upon inspection, would pass.  *Parsons* v. *Johnson,* 68 N. Y. 62, 65.  *Bonelli Bros.* v. *Blakemore,* 66 Miss. 136.  *Fetters* v. *Humphreys,* 4 C. E. Green, 471.  *Young* v. *Pennsylvania Railroad,* 43 Vroom, 94, 98.  *Kelly* v. *Dunning,* 16 Stew. 62.  *Whiting* v. *Gaylord,* 66 Conn. 337.  *Oliver* v. *Hook,* 47 Md. 301.  *Francie's appeal,* 96 Penn. St. 200.  *Suffield* v. *Brown,* 4 DeG., J. & S. 185.  *Polden* v. *Bastard,* L. R. 1 Q. B. 156. But those decisions do not apply to this case.  We have here a roadway of considerable width, situated in the residential and business part of a thriving city, used as appurtenant both to private residences and to business properties and wharves, running between well defined bounds, and actually built or wrought upon the surface of the ground.  A glance would show that it was intended to be used and was in fact used for the purposes of a public street so far as concerned the accommodation of those who occupied properties abutting upon it or reached by it.  As to Mr. Pew, who had laid it out and wrought it for travel, though not to the general public, it stood in the place of a public street.  This case is distinguished from most of the decisions just referred to, and comes within the exception stated in some of them.  It is directly within the language used in *Fetters* v.

*Humphreys*, 3 C. E. Green, 260, and the decision in *Rollo* v. *Nelson*, 26 L. R. A. (N. S.) 315. And in many of our own decisions already referred to, rights of way have been held to arise by implication.

It is necessary that the right should have been in use at the time of the grant of the principal estate. This was held in many of the cases already referred to. See also *Haverhill Savings Bank* v. *Griffin*, 184 Mass. 419; *Hart* v. *McMullen*, 30 Canada S. C. 245. But the Land Court has found that this was the case, and that there has been no abandonment of the use; and the occasional opening or closing of gates, with or without a fastening and for a longer or shorter time, raises only a question of fact which has been passed upon at the trial and which we cannot reopen.

Nor, for somewhat similar reasons, can we say that the right of the respondents to use this way is limited to the two gates by which entrance was had from the way into the garden and stable lot. The apparent and obvious purpose of Mr. Pew in constructing this way, so far as his homestead estate was concerned, was to provide accommodation for that estate, the particular mode of use being left to the convenience and desires of the occupants from time to time. This was the right which he enjoyed, and, which he intended to pass to his widow by the broad language of his devise to her.

So, too, it cannot be said as matter of law, whatever might have been found at the trial as matter of fact, that the easement can be upheld only for domestic purposes. The right created was appurtenant to the homestead estate, and was not limited to any particular purposes. According to the finding of the Land Court and the ruling made thereon, " both at the time the will was made and at the time of the testator's death, the homestead as enclosed had, in actual use in connection with it and reasonably necessary to its enjoyment, access over the way for all purposes for which a private way could ordinarily and properly be used." So far as this is a finding of fact, we cannot review it; as a ruling, it properly followed from the findings which appear to have been made. *Salisbury* v. *Andrews*, 19 Pick. 250, 256. *Parks* v. *Bishop*, 120 Mass. 340. *Baldwin* v. *Boston & Maine Railroad*, 181 Mass. 166. And see *Fox* v. *Union Sugar Refinery*, 109

Mass. 292; *Goss* v. *Calhane*, 113 Mass. 423; *Boland* v. *St. John's Schools*, 163 Mass. 229, 237.

Abandonment is of course a question of fact. *New England Structural Co.* v. *Everett Distilling Co.* 189 Mass. 145.

There is no such fundamental change of use here as was shown in *Great Western Railway* v. *Talbot*, [1902] 2 Ch. 759, and similar cases.

It is to be observed that we have here the case of an easement passing by the plain intention of a testator, not solely by necessary implication, and not at all an attempt to create one by an implied reservation contrary to the terms of the grant itself. That would have presented a more difficult question, which need not here be considered.

The petitioner's main contentions have been disposed of by what has been said. Its requests for rulings, so far as they were refused and have not been dealt with already, seem to have become immaterial because the protases thereof were not found by the judge. We discover no error in their refusal.

The industry of the petitioner's counsel has collected many cases, not all of which have been cited though all have been examined, in which claims that easements had been created by implication upon the severance of estates previously held in a single ownership have been overruled. They seem almost without exception to have been decided either on the ground that no intent to create such easements had been manifested, or by reason of the absence of some one or more of the necessary grounds which have been stated. They do not furnish authority for the decision of this case.

*Exceptions overruled.*